HUNTER FAULCONER, SR., AND MARY T. FAULCONER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Faulconer v. Commissioner
Docket No. 1096-79.
United States Tax Court
T.C. Memo 1983-165; 1983 Tax Ct. Memo LEXIS 618; 45 T.C.M. (CCH) 1084; T.C.M. (RIA) 83165; March 29, 1983. *618 Held: Petitioner's operation of a farm was not an activity engaged in for profit. V. R. Shackelford, Jr., for the petitioners. John C. McDougal, for respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: Respondent determined deficiencies in petitioners' Federal income taxes, as follows: Year
Deficiency
1970
$16,858.49
1972
10,681.00
1973
19,896.00
1975
11,462.00
Petitioners have filed an amendment to their petition in which they claim that there was an overpayment of tax in 1972 in the amount of $1,444. In an answer to the petition as amended, respondent alleges that the correct amount of the deficiency for 1975 is $13,200. [1] *619 The sole issue presented for our decision is whether petitioners' operation of a farm was an activity engaged in for profit within the meaning of section 183. [2] *620 Our determination as to this issue will automatically resolve whether petitioners are entitled to investment tax credits for assets purchased for their farm, whether the credits taken by petitioners for the Federal excise tax on fuels should be determined on the basis of farm use, and whether petitioners are entitled to deduct losses attributable to their farming activity in computing their net earnings from self-employment. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts, second stipulation for trial, and the stipulated exhibits are incorporated herein, by this reference. The petitioners are husband and wife. At the time they filed their petition herein, they resided in Charlottesville, Virginia. Petitioners filed a joint Federal income tax return for the year 1970 with the Internal Revenue Service Center, Philadelphia, Pennsylvania. For the years 1972, 1973, and 1975, petitioners filed joint Federal income tax returns with the Internal Revenue Service Center, Memphis, Tennessee. Since Mary T. Faulconer is a party solely because she filed joint tax returns with her husband, all references to "petitioner" in the singular refer to Hunter Faulconer, Sr. Petitioner is 75 years old. For approximately 60 years, he has resided in Albemarle County, Virginia. In 1930 he graduated from the University of Virginia. Since 1950 petitioner has been actively engaged in the horse breeding, racing and selling operations and the beef cattle breeding and selling operations conducted on two farms in Albemarle County. Petitioners' residence is located *621 in one of the farms, which is known as "Westover." Westover contains 325.25 acres, most of which is cleared land. The other farm is known as "Buck Island." It contains 490 acres, most of which also is cleared land. The following buildings are located on the two farms, which are used as a single farming enterprise: Westover
Buck Island
2 tenant houses
1 tenant house
2 horse barns
3 hay barns
1 stallion shed
1 machine shed
1 hay barn
1 cow shed
1 machine shop
miscellaneous farm buildings Westover and Buck Island were previously owned and operated by petitioner's father, Percy H. Faulconer, who died in 1947. Percy H. Faulconer's will created the Percy H. Faulconer Trust (herein the trust). His will also directed essentially the following dispositions of Westover and Buck Island. The family home, which is situated on Westover, and approximately 5 acres surrounding it were devised to Percy H. Faulconer's wife, Stella Faulconer (herein Stella), for life. The remainder of the Westover Farm was devised to the trust for the life of Stella. Upon Stella's death, the entire Westover Farm, including the residence, was to pass to petitioner for life or until he should choose to no longer reside at Westover, *622 and subsequently, pass to the trust. The will further directed that, during petitioner's life tenancy, all real estate taxes and insurance on Westover be paid by the trust. Buck Island was devised directly to the trust. From 1970 through 1976 petitioners and their three children were the income beneficiaries of the trust in equal shares. The trust is to terminate upon the death of the survivor of petitioners. The trust estate, including the real estate, is to be distributed equally among petitioners' children and to the issue, perstirpes, of any children then deceased. Following the death of Percy H. Faulconer, but during Stella's life, petitioner leased Buck Island and Westover, exclusive of the dwelling and dependencies, from the trust for $1,800 per year. After Stella's death in 1965, when the life estate in all Westover passed to petitioner, petitioner began to pay rent of $500 per year for Buck Island alone. The rent was increased in 1970 to $700 and in 1971 to $1,000, at which it has remained since then. Petitioner's father had operated both farms from 1915 until his death in 1947. From the time of his father's death until January 1950, petitioner, as executor of his *623 father's estate, operated the farms. In January 1950 petitioner purchased the livestock and equipment of both farms for $52,046.08. Thereafter petitioner began to operate the farms as his own operation, but he continued to conduct the operation in approximately the same manner as his father had conducted it. Before starting to operate the farm on his own behalf, petitioner made no investigation to determine whether the continued operation would be a profitable activity. At trial petitioner testified that he did not know whether the farming operation had produced a profit in the years prior to 1947. He was unable to recall whether it had generated a profit from 1947 to 1950. Before 1975 petitioner kept approximately 12 broodmares and the foals and weanlings produced by those broodmares at Westover. He also kept between 30 and 50 cattle at Westover and approximately 75 cattle at Buck Island. Monetarily the breeding and selling of cattle are an insubstantial portion of petitioner's operation. Petitioner mostly races horses which have been bred and raised by him.From time to time, however, he has purchased fillies, which he has raced before adding them to his band of broodmares.In *624 addition, he occasionally has purchased colts for racing purposes. Petitioner participates in the maintenance and care of the broodmares and their foals until the late Fall of their yearling year, which is handled at the farms. He selects sires to which his mares are bred, supervises the handling of the mares and their foals, decides when the foals should be weaned, supervises the early handling of the yearlings, and weans out and arranges for the sale or disposal of mares having no further use for breeding and foals and weanlings having insufficient potential for training as race horses. Until 1966 petitioner performed physical labor on the farms.Following operations for detached retinas in both eyes and on the advice of his doctors, petitioner, however, has curtailed his physical activities on the farm. In late Fall of each year, the yearlings are sent to an adjoining farm where they are broken. After being broken, they are maintained at Westover until petitioner sends them to his trainer as 2-year olds for further training. Petitioner determines when the yearlings shall be sent to a trainer at the track. He keeps in close touch with the trainers and participates in decisions concerning *625 the races in which the horses shall be entered and the retirement or sale of horses in training. Neither petitioner nor any members of his family ride any of the horses. Petitioner is a member of the Virginia Thoroughbred Association. He has subscriptions to TheBloodHorse,TheThoroughbredRecord, and TheDailyRacingForm.[3] In addition, he receives the SupplementStallionRegister of TheBloodHorse, which contains extensive details on stallions available for breeding, including their pedigrees, stud fees, and the winnings of their progeny. The stud analyses contained in the SupplementStallionRegister of TheBloodHorse for 1978 on three stallions -- Cyane,FirstLanding, and GunShot -- used by petitioner for breeding purposes include the following data: Number of
Number of
Total Earnings
Horse
Foals
Winning Foals
of Winning Foals
Cyane
205
130
$9,289,439
First Landing
328
208
7,956,791
Gun Shot
280
177
4,304,438
The Jockey Club at Lexington, Kentucky, keeps statistical *626 data, which always has been available to petitioner for a modest fee, on thoroughbred horses. The following schedule, compiled from this statistical data, reflects the winnings of the foals of the mares owned by petitioner from 1970 through 1976: No. of Foals
Winnings of
Name of Mare
No. of Foals
Winning Purses
All Foals
* Royal Ripple
13
10
$ 267,169.00
Rain's Over  5
4
146,144.00
* Aunt Rosita
10
10
572,492.00
B Hunt  8
8
198,461.00
* Sister Sarah
7
6
174,415.00
* Will's Gray
7
3
14,814.00
Wind Rip  10
8
135,085.00
* Good Bet
3
3
14,399.00
Land Hunt  3
3
28,897.00
* Polly F
5
4
140,132.00
$1,818,008.00
Petitioner keeps all records of the farming operation. He maintains a special farm account at National Bank and Trust Company, Charlottesville, Virginia. All receipts are deposited to, and farm expenses paid from, this account.When necessary, petitioner draws checks on his personal checking account and deposits the proceeds of such checks to the farm account to cover farm expenses. Only payments for farm purposes are made out of the special farm account. Petitioner receives bank statements and canceled checks *627 monthly.He regularly reconciles the bank statements with his own records. Perhaps twice per year petitioner compiles data showing all cash deposits to, and all cash disbursements from, the special farm account. He classifies the deposits and the disbursements, so as to show the nature of the receipts and expenses and the total in each category. At the end of each year, this information is submitted by petitioner to his certified public accountant, who uses it in preparing petitioners' income tax returns. Petitioner prepares no budgets for his farming operation. In addition, no monthly, quarterly, or annual statements of income and expenses are kept other than as reflected in the copies of Horseman's Accounts furnished by the tracks and in the data compiled by petitioner in connection with the preparation of his income tax returns. The Horseman's Accounts contain only a running account of transactions on a daily basis, not summary information. Each track at which petitioner stables and races his horses maintains a Horseman's Account, copies of which are regularly furnished to petitioner. The Horseman's Account sets out each race in which petitioner has a horse entered, the names *628 of the horse and jockey, where the horse finishes, if the horse is in the money, and the amount won in each race. The amount paid for any horse claimed in a claiming race [4] at the track also is credited to the accounts. Debits to the account are made only for jockey and lead pony fees. The account balance at the end of a season at one track is either transferred to petitioner's account at another track to which his horses have been moved or withdrawn by petitioner. When payments are made directly to petitioner, he deposits the funds in the farm account. Since becoming engaged in his farming operation, petitioner has kept his accounts on a cash basis and *629 treated payments made to him and deposited in his farm account as income. His income tax returns were likewise prepared. Rather than treating proceeds credited to his Horseman's Accounts for purses won as income in the year in which they were credited to his accounts and subject to withdrawal by him, petitioner treated such proceeds as income in the year in which they were actually received by him. After the petition was filed in this case, it was determined that earnings should have been reported as income in the year earned and credited to petitioner's Horseman's Accounts, as opposed to when received and deposited by him to the farm account. The following schedule reflects the expenses of petitioners' cattle and horse operation and the income (with earnings at tracks included in the years earned, rather than the years paid to petitioner) from that operation: HUNTER FAULCONER, SR., & MARY T. FAULCONER
FARM INCOME & EXPENSES 1970-76 incl.
INCOME: 1970
1971
1972
Sale of Livestock and Farm Products: Cattle: Ordinary sales
$13,660.32 $ 7,659.00 $18,771.00 1231 sales capital assets
2,286.00 Horses: Ordinary sales
26,000.00 77,125.00 19,000.00
1231 sales capital assets
GROSS Racing purses
20,005.00 26,154.84 24,892.80 LESS: Jockey & Lead Fees
(2,763.00)
(3,140.00)
(3,201.40)
NET Racing Purses
17,242.00 23,014.84 21,691.40 Agricultural Program Payments
Wheat
$56,842.32 $110.084.84 $59,462.40 FARM EXPENSES: Labor
$ 7,132.00 $7,296.00 $ 7,356.00 Feed
4,968.96 5,518.00 6,976.00 Breeding fees & training
60,950.70 61,762.00 44,817.00 Seed & fertilizer
2,284.48 1,066.00 1,738.00 Veterinary & medicine
4,265.50 3,951.00 2,042.00 Gas & oil
1,341.55 1,530.00 1,537.00 Insurance
3,890.45 866.00 669.00 Registration fees & manuals
623.50 912.00 1,121.00 Tractor & auto
2,459.36 2,574.00 2,001.00 Baling
1,641.87 355.00 1,439.00 Repairs & Maintenance
2,273.30 2,519.00 2,858.00 Painting
1,500.31 1,332.00 2,318.00 Rent
700.00 1,000.00 1,000.00 Total cash expenses
$94,031.98 $ 90,701.00 $75,872.00 Depreciation
5,824.39 5,102.00 5,806.00 TOTAL DEDUCTIONS
$99,856.37 $ 95,803.00 $81,678.00 NET FARM PROFIT OR LOSS
$ (43,014.05)
$ 14,281.84 $ (22,215.60)
*630 HUNTER FAULCONER, SR., & MARY T. FAULCONER
FARM INCOME & EXPENSES 1970-76 incl.
INCOME: 1973
1974
1975
1976
Sale of Livestock and Farm Products: Cattle: Ordinary sales
$17,153.00 $10,815.00 $ 7,850.00 $10,155.00 1231 sales capital assets
Horses: Ordinary sales
29,500.00 78,950.00 18,500.00 29,500.00 1231 sales capital assets
54,217.00 (12,159.00)
GROSS Racing purses
32,445.40 16,041.20 41,037.00 37,036.00 LESS: Jockey & Lead Fees
(3,986.20)
(2,159.50)
(5,800.00)
(3,540.00)
NET Racing Purses
28,459.20 13,881.70 35,237.00 33,496.00 Agricultural Program Payments
957.00 Wheat
1,859.00 $75,112.20 $106,462.70 $115,804.00 $60,992.00 FARM EXPENSES: Labor
$ 9,755.00 $ 10,789.00 $9,177.00 $ 8,639.00 Feed
6,965.00 6,627.00 3,298.00 5,474.00 Breeding fees & training
57,635.00 74,258.00 75,567.00 48,947.00 Seed & fertilizer
813.00 3,608.00 191.00 220.00 Veterinary & medicine 3,463.00 3,709.00 2,548.00 1,438.00 Gas & oil
1,710.00 2,021.00 2,006.00 2,676.00 Insurance
2,073.00 2,113.00 2,110.00 2,650.00 Registration fees & manuals
1,115.00 1,321.00 1,502.00 1,233.00 Tractor & auto
2,163.00 3,955.00 2,842.00 2,663.00 Baling
1,462.00 2,300.00 5,363.00 3,395.00 Repairs & Maintenance
2,307.00 2,218.00 2,650.00 1,571.00 Painting
1,711.00 Rent
1,000.00 1,000.00 1,000.00 1,000.00 Total cash expenses
$90,461.00 $113,919.00 $109,965.00 $79,856.00 Depreciation
5,554.00 5,710.00 2,679.00 2,426.00 TOTAL DEDUCTIONS
$96,015.00 $119,629.00 $112,644.00 $82,282.00 NET FARM PROFIT OR LOSS
$ (20,902.80)
$ (13,166.30)
$ 3,160.00 (21,290.00)
*631 From 1950 through 1969, inclusive, petitioners had farm losses, as follows: HUNTER FAULCONER - SCHEDULE OF PROFIT AND LOSS
FARMING OPERATIONS - 1950-1969, inclusive
RACING
HORSE SALES
OTHER FARM
TOTAL
TOTAL FARM YEAR
PURSES
NOT CAPITAL GAIN
INCOME
RECEIPTS
EXPENSES
1950
$ 2,770.00
$ 500.00
$ 6,663.72
$ 9,933.72
$31,085.67
1951
4,657.25
$7,560.02
12,481.42
24,698.69
45,081.98
1952
26,735.00
200.00
8,867.84
35,802.84
67,345.58
1953
23,070.00
11,801.64
34,871.64
67,503.45
1954
6,710.00
14,482.28
21,192.28
66,009.29
1955
11,041.20
6,173.19
17,214.39
60,130.78
1956
7,035.00
10,882.34
17,917.34
58,099.44
1957
35,672.25
13,029.75
48,702.00
90,648.11
1958
32,692.25
14,428.50
47,120.75
86,435.39
1959
22,184.20
9,212.69
31,396.89
92,343.71
1960
24,047.55
14,409.76
38,457.31
83,525.14
1961
18,873.12
13,308.41
32,181.53
72,303.17
1962
13,345.75
10,408.00
23,753.75
78,979.38
1963
17,408.80
10,303.06
27,711.86
76,099.80
1964
19,052.87
4,739.18
23,792.05
87,150.17
1965
17,328.50
17,500.00
9,766.70
44,595.20
95,569.64
1966
2,139.00
10,483.00
9,654.85
22,276.85
80,929.81
1967
16,915.20
11,612.88
28,528.08
84,417.21
1968
20,620.30
10,674.89
31,295.19
97,832.12
1969
36,921.80
11,494.84
48,416.64
304,999.90
HUNTER FAULCONER - SCHEDULE OF PROFIT AND LOSS
FARMING OPERATIONS - 1950-1969, inclusive
PROFIT & LOSS BEFORE
CAPITAL GAIN SALE
PROFIT & LOSS
YEAR
CAPITAL GAIN
OF HORSES & CATTLE
AFTER CAPITAL GAIN
1950
($21,151.95)
($21,151.95)
1951
($20,383,29)
($20,383.29)
1952
($31,542.74)
($31,542.74)
1953
($32,631.81)
$14,250.00 ($18,381.81)
1954
($44,817.01)
9,500.00 ($35,317.01)
1955
(42,916.39)
11,250.00 ($31,666.39)
1956
($40,182.10)
10,350.00 ($29,832.10)
1957
($41,946.11)
12,095.97 ($29,850.14)
1958
($39,314.64)
29,460.66 ($ 9,853.98)
1959
($60,946.82)
13,454.07 ($47,492.75)
1960
($43,067.83)
16,390.75 ($28,677.08)
1961
($40,121.64)
($40,121.64)
1962
($53,225.63)
12,000.00 ($43,225.63)
1963
($48,387.94)
7,486.89 ($40,901.05)
1964
($63,358.12)
11,814.22 ($51,543.90)
1965
($50,974.44)
19,234.59 ($31,739.85)
1966
($58,652.96)
4,182.93 ($54,470.03)
1967
($55,889.13)
3,264.01 ($52,625.12)
1968
($66,536.93)
37,645.78 ($28,891.15)
1969
($56,583.26)
(3,873.10)
($60,456.36)
Petitioner *632 normally employs a farm manager and three farm laborers to assist him with the farming operation. In 1974, petitioner's farm manager, who had worked in that capacity for approximately 50 years, died. As a result of this severe loss, the sale of the weanlings in 1974 and most of the mares in 1975 was necessitated. The sale of the broodmares in 1975 resulted in the section 1231 sales in that year. Since petitioner has been unable to engage an experienced replacement for his farm manager, the size of his farm operations has been substantially reduced. Dr. Frank A. O'Keefe, V.M.D., graducated from the University of Pennsylvania in 1943 with a degree in veterinary medicine. Dr. O'Keefe owns Pine Brook Farm, in Bealton, Virginia, on which he conducts a commercial thoroughbred breeding and selling operation. Since 1943 his total sales of yearlings have generated more than $3,000,000. Among the horses bred, raised, and sold by Dr. O'Keefe is KauaiKing (63), which had winnings in excess of $350,000, having won the Kentucky Derby and the Preakness in 1966, and was the first stallion syndicated for $2,000,000. Dr. O'Keefe is a former president of the Virginia Thoroughbred Association. *633 Currently, he is a member of the board of directors and the finance committee of Fasig-Tipton Sales Company, one of the outstanding sales companies of thoroughbreds in the world. Dr. O'Keefe frequently has been asked for advice in connection with petitioner's breeding and racing operation. On numerous occasions, he has visited petitioner's farms to check the broodmares and to advise petitioner in connection with the selection of stallions for breeding purposes. When the tax law was changed in 1969, as discussed later in this opinion, to give a taxpayer a presumption that his horse or cattle activity is engaged in for profit if it makes a profit in any 2 of 7 consecutive taxable years, petitioner became aware of the change through horse racing professional associations and publications. At that time, petitioner asked Dr. O'Keefe, "What can I do to show a profit?" Dr. O'Keefe advised petitioner to sell more horses and not to race as many. [5] Aside from this occurrence in 1969, petitioner has not asked Dr. O'Keefe to advise him how his horse breeding, racing, and selling operation could be made profitable. Neither has petitioner made an analysis of his operation to determine whether *634 he could reduce expenses or shift the emphasis of his operation, so as to make a profit. The schedule below indicates (1) the racing horses sold by petitioner and those claimed from petitioner (see footnote 4, supra) from 1970 through 1976, inclusive, (2) the dates on which such horses were sold or claimed, (3) the amount paid for each horse, and (4) the amount won by each horse from the date it was sold or claimed through 1976: NATURE
OF
DATE OF SALE
HORSE SOLD
SALE
SELLING PRICE
1/1/70
Good Bet - 65
C.R.
$6,500.00
1/31/70
Spanish Blue - 65
C.R.
7,500.00
6/29/70
* Next Ripple - 68
P.S.
6,000.00
12/9/70
Short Shower - 67
P.S.
6,000.00
2/22/71
Gun Wadding - 68
C.R.
10,000.00
3/31/71
Next Wind - 68
P.S.
1,125.00
5/14/71
Spring Practice - 67
C.R.
7,500.00
7/23/71
* Fair Year - 69
P.S.
7,500.00
9/28/71
*Field House - 69
P.S.
12,000.00
9/30/71
Spanish Ruler - 67
P.S.
15,000.00
10/28/71
* Rippling Tide - 69
P.S.
4,000.00
11/30/71
* Clarence - 69
P.S.
20,000.00
7/30/72
* Anne F - 70
P.S.
10,000.00
8/15/72
* Windsomer - 70
P.S.
9,000.00
6/15/73
* Mr. B. P. - 71
P.S.
8,500.00
8/31/73
* Little Sword - 71
P.S.
1,950.00
12/27/73
Eddie F - 69
C.R.
20,000.00
6/13/74
* My Friend - 72
P.S.
20,000.00
6/13/74
* Fundamental Miss - 72
P.S.
20,000.00
5/20/74
Ted Laird - 70
C.R.
5,000.00
10/28/74
Seepage - 71
C.R.
5,000.00
7/10/75
Tilka - 72
C.R.
5,000.00
10/27/75
Tricky Wicky - 72
C.R.
5,000.00
11/21/75
* To Hunt - 73
C.R.
8,500.00
1/26/76
Hunter F - 71
C.R.
11,500.00
3/15/76
Beginner - 72
P.S.
4,500.00
3/24/76
Jolly Polly - 73
C.R.
11,500.00
10/20/76
C. Alphonso - 73
C.R.
6,500.00
*635 TOTAL
TOTAL
FOR
AMT. WON
FOR
YEAR
AFTER SALE
YEAR
1/1/70
$20,306.00
1/31/70
11,826.00
6/29/70
15,930.00
12/9/70
$ 26,000.00
3,473.00
$ 51,535.00
2/22/71
69,166.00
3/31/71
6,628.00
5/14/71
47,807.00
7/23/71
12,309.00
9/28/71
92,398.00
9/30/71
33,574.00
10/28/71
11/30/71
77,125.00
39,751.00
301,633.00
7/30/72
9,813.00
8/15/72
19,000.00
10,990.00
20,803.00
6/15/73
38,762.00
8/31/73
868.00
12/27/73
30,450.00
11,950.00
51,580.00
6/13/74
26,604.00
6/13/74
14,571.00
5/20/74
19,119.00
10/28/74
50,000.00
834.00
61,128.00
7/10/75
15,815.00
10/27/75
13,450.00
11/21/75
18,500.00
12,544.00
41,809,00
1/26/76
27,460.00
3/15/76
2,160.00
3/24/76
8,636.00
10/20/76
34,000.00
4,050.00
42,306.00
$255,075.00
$570,794.00
P.S. - Private Sale C.R.-Claiming Race Petitioner sold, in addition to the racing horses set forth above, four weanlings for $28,000 on December 23, 1974, and six broodmares and a stallion for $75,300 in February 1975. As previously indicated, the sales of the broodmares and weanlings were necessary because of the death of petitioner's farm manager. The appraised fair market value of Westover and Buck Island as determined by the Department of Finance, Albemarle County, for *636 real estate tax assessments in 1970 and 1979, and the percentage increases in value during this period were as follows: Increase in
Percentage
1970
1979
value
Increase
Westover
$760,500
$1,923,600
$1,163,100
153%
Buck Island
87,500
316,900
229,400
262%
$848,000
$2,240,500
$1,392,500
164%
From 1970 through 1976, petitioner had income from sources other than the farming operation as set forth in the following schedule: Trust
Interest
Director's
Dividends
Income
Income
Fees
1970
$35,847.78
$19,321.96
$790.64
$1,495.00
1971
60,530.00
518.00
772.00
1,740.00
1972
60,784.00
751.00
1,855.00
1973
63,408.00
730.00
2,615.00
1974
66,335.00
1,825.00
3,470.00
1975
74,637.00
2,160.00
1,361.00
3,030.00
1976
77,863.00
446.00
15,880.00
3,380.00
Rental Income
Wages,
and Expense
Salaries
Total
1970
$ (1,526.89)
$1,200.00
$57,128.49
1971
(1,882.00)
1,200.00
63,678.00
1972
1,416.00 1,200.00
65,506.00
1973
7,198.00 2,450.00
78,401.00
1974
(1,821.00)
3,150.00
72,959.00
1975
(1,515.00)
4,800.00
84,473.00
1976
(33,703.00)
7,200.00
71,066.00 Petitioners timely filed an election under section 183(e) to postpone until the end of 1976 the application of section 183(d) to their farming activity. OPINION The sole issue is whether petitioner's cattle and horse operation was an activity not engaged in *637 for profit within the meaning of section 183. Section 183 was enacted as part of the Tax Reform Act of 1969 and is effective for taxable years beginning after December 31, 1969. Section 183(a) provides that, except as otherwise provided in that section, no deduction shall be allowed an individual taxpayer for expenses attributable to an "activity not engaged in for profit." The allowable deductions attributable to an activity not engaged in for profit are set forth in section 183(b), which is set out in the margin. [6] *638 The term "activity not engaged in for profit" is defined by section 183(c)[7] as any activity other than one with respect to which deductions are allowable for the taxable year under section 162[8] or under paragraph (1) or (2) of section 212. [9]
Section 183(d)[10] *640 provides that, in the case of an activity consisting in major part of the breeding, *639 training, showing, or racing of horses, the activity shall be presumed to be engaged in for profit if for any 2 of the 7 immediately preceding years gross income derived from such activity exceeds deductions attributable to the activity, unless the Commissioner establishes to the contrary. If the taxpayer files an election under section 183(e), [11] *641 the applicability of the presumption is not to be determined before the close of the 6th taxable year following the year in which the taxpayer first engaged in the activity. If an election is made and there are 2 or more profit years before the close of the 7th year in which the taxpayer has engaged in the activity, the presumption shall apply to each of the first 7 years, subject to certain conditions. For this purpose, a taxpayer is considered to have not been engaged in an activity in a year beginning before January 1, 1970. The parties have stipulated that petitioners timely filed an election under section 183(e) to postpone until the end of 1976 the application of section 183(d) to their farming activity. They have further stipulated that, petitioners having had 2 profit years (1971 and 1975) from 1970 through 1976, the presumption that petitioner's farming activity was engaged in for profit applies to each taxable year in the 7-year period beginning with 1970. Respondent contends that, the presumption in favor of petitioners is "easily overcome," because the profits realized by petitioners from the farming operation in 1971 and *642 1975 are of insignificant amounts in the context of this case and the profit generated in 1975 did not result from the ordinary operation of the farm, but from an extraordinary dispersal sale of most of petitioner's breeding stock. Respondent further contends that, aside from the question of the weight to be given the presumption, the evidence overwhelmingly establishes that petitioner did not engage in the farming activity with the primary purpose or intention of making a profit. The test for determining whether an activity is engaged in by a taxpayer for profit is whether the taxpayer engaged in the activity with the predominant purpose and intention of making a profit. Allen v. Commissioner,72 T.C. 28, 33 (1979); Dunn v. Commissioner,70 T.C. 715, 720 (1978), affd. on another issue 615 F.2d 578 (2d Cir. 1980).The taxpayer's expectation of profit need not be a reasonable one, but the facts and circumstances must indicate that he had an actual and honest objective of making a profit. Section 1.183-2(a), Income Tax Regs.; Dreicer v. Commissioner,78 T.C. 642, 645 (1982), on appeal (D.C. Cir., June 1, 1982); Allen v. Commissioner,supra at 33. Section 1.183-2(b), Income Tax Regs., *643 sets forth a list of factors which normally should be considered in determining whether an activity is engaged in for profit: (1) the manner in which the taxpayer carries on the activity, (2) the expertise of the taxpayers or his advisors, (3) the time and effort expended by the taxpayer in carrying on the activity, (4) the expectation that the assets used in the activity may appreciate in value, (5) the success of the taxpayer in carrying on other similar or dissimilar activities, (6) the taxpayer's history of income or losses with respect to the activity, (7) the amounts of occasional profits, if any, which are earned, (8) the financial status of the taxpayer, and (9) the elements of personal pleasure or recreation in conducting the activity. Considering the present case in light of the applicable regulations, we think that respondent has established that petitioner's farming operation was not an activity engaged in for profit, even if, arguendo, we treat the section 183(d) presumption as being fully operative.Therefore, we need not decide whether the presumption under section 183(d) should be accorded its usual weight although the amounts of the profits earned in 1971 and 1975 *644 are insignificant in relation to the amount of the total loss incurred by petitioner and the profits earned in 1975 are attributable to the sale of most of petitioner's breeding stock. Factor (1): The Manner in which the Taxpayer Carries on the Activity.
Initially, the manner in which petitioner conducted his farming operation belies a concern for profits.Admittedly, petitioner did not intermingle financial records of the farms with his own personal records, and his farm records were adequate for purposes of preparing income tax returns. The books and records, however, were not employed to achieve petitioner's alleged objective of earning a profit. Petitioner had no budgets or operating statements prepared for his farming operation. Nor did he use his farm records to determine how costs could be controlled or to determine whether certain parts of the farm operation should be emphasized, because of their profit potential. Golanty v. Commissioner,72 T.C. 411, 430 (1979), affd. 674 F.2d 170 (9th Cir. 1981). Factor (2): The Expertise of the Taxpayer or his Advisors.
Respondent has conceded petitioner's expertise in the training and breeding of horses gained by conducting his operation, *645 the expertise of the professionals employed by petitioner to care for, and train, the horses, and the fact that petitioner consulted experts and professional periodicals when making breeding decisions. Respondent maintains, however, that the facts that petitioner only sought advice once in 27 years as to how to make his horse and cattle operation profitable and that the occasion for seeking such advice was the passage of the Tax Reform Act of 1969, which provides for the raising of a presumption in favor of a taxpayer whose operation shows a profit, evince an absence of a true concern for profits. In 1950, when petitioner began to operate the farms on his own behalf, he made no attempt to ascertain whether they could be operated so as to produce a profit. See section 1.183-2(b)(2), Income Tax Regs.; Eastman v. United States,225 Ct. Cl. 298, 635 F.2d 833, 838 (1980). Moreover, it is clear to us that the only time petitioner sought advice as to the business aspects of his operation was in 1969 when he asked Dr. O'Keefe to advise him how he could show a profit. Despite petitioner's protestations to the contrary, we are unpersuaded that petitioner asked for this advice with the objective *646 of making a profit, that is, with the objective of earning sufficient profits to offset the losses incurred during the previous years of the operation. Bessenyey v. Commissioner,45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967). Rather, we think that petitioner primarily was interested in planning for gross income derived from the activity to exceed deductions attributable to the activity for at least 2 years in the succeeding period of 7 consecutive taxable years, so as to have the benefit of the presumption provided by section 183(d). We reach this conclusion for several reasons. Initially, Dr. O'Keefe's testimony given at trial clearly indicates that petitioner desired advice as to how he could ensure that his operation would be profitable for 2 years out of the next 7 years and Dr. O'Keefe advised petitioner how to achieve this objective. First, Dr. O'Keefe observed that after one sells his horses, he, of course, has nothing to race and no means of earning money. Yet, Dr. O'Keefe advised petitioner to sell his horses and not race as many horses. Considering Dr. O'Keefe's opinion as to the result that would ensue if petitioner were to follow his advice, we think *647 it manifest that the purpose of his advice was not to assist petitioner to recoup over $700,000 in losses. Second, the following testimony given by Dr. O'Keefe indicates even more clearly that the purpose of his advice was to help petitioner obtain the benefit of the presumption provided by section 183(d), rather than make a profit: See, [petitioner] spoke to me in 1968 and '69 when this new tax bill came in. He said "What can I do to show a profit?" I said, "I think you would be better off selling more horses and not racing as many," and I think the results show that we have shown a profit in two out of the seven years.
In addition, petitioner admitted that, when the law was changed, professional associations and publications made him aware of the presumption given a taxpayer if he shows a profit in 2 years out of the 7 initial years of an activity consisting in major part of the breeding, training, showing, or racing of horses Petitioner then testified, however, that he could not say whether he asked Dr. O'Keefe for advice as a result of such knowledge. We consider petitioner's self-serving testimony in this regard to be unbelievable. Petitioner is an educated man. We think he *648 fully appreciated the benefit to a taxpayer of showing profits for the requisite 2 years and framed his inquiry to Dr. O'Keefe in terms of showing a profit for such years, not achieving a true profit. Factor (3): The Time and Effort Expended by the Taxpayer in Carrying on the Activity.
Petitioner devoted much time and effort to his horse and cattle activity. Although this factor would normally indicate an objective of making a profit, section 1.183-2(b)(3), Income Tax Regs., we think it is of little significance in the present case.The evidence before us indicates that during the years in issue petitioners received considerable amounts of passive income (dividends, interest, and trust income), which constituted the principal source of their livelihood. Hence, petitioner did not have to work for a living. Indeed, since petitioner states on brief that for many years he has devoted his full time to his farming operation, we can only infer that the demands placed on petitioner's time by activities from which he received personal service income (fees and salaries) were negligible. Thus, we agree with respondent that the time dedicated by petitioner to his horse and cattle operation *649 did not intrude on time that he otherwise would have spent on income-generating activities.[12]
Factor (4): The Expectation that Assets Used in the Activity May Appreciate in Value.
Petitioner submits that the fact that Westover and Buck Island have appreciated in value should be taken into consideration in determining whether the farming activity was engaged in for profit. In this connection, he points out that section 1.183-2(b)(4), Income Tax Regs., provides that the term "profit" encompasses appreciation in the value of assets, such as land, used in the activity. Respondent has provided that, for purposes of section 1.183-2(b)(4), Income Tax Regs., the definition of activity in paragraph (d) of section 1.183-1, Income Tax Regs., is applicable. [13] *650 *651 Section 1.183-1(d)(1), Income Tax Regs., provides that the holding of land and a farming activity may, under certain circumstances, be considered a single activity under section 183. As previously mentioned, pursuant to the will of petitioner's father, Buck Island passed directly to the trust and Westover was to pass to the trust at petitioner's death or at such time as he should decide to no longer reside at Westover. *652 Petitioner has presented no evidence to establish that Buck Island and Westover were primarily held either with a view to realization of the increase in their values or for the purpose of engaging in the horse breeding, racing, and selling operations and the beef cattle breeding and selling operations.[14] *653 *654 See section 1.183-1(d)(1), Income Tax Regs.; Engdahl v. Commissioner,72 T.C. 659, 668, n. 4 (1979). Indeed, petitioners' statement on brief, that, their incentive to continue holding the land is enhanced, since after their deaths Westover and the corpus of the trust which holds Buck Island will pass outright to their children, suggests that the properties were held for neither of the aforementioned purposes. Absent evidence as to the primary purpose for which Buck Island and Westover were held, we are unable to conclude that the holding of Buck Island and Westover and the horse and beef cattle operations should be considered a single activity for purposes of determining expected appreciation in the value of assets under section 1.183-2(b)(4), Income Tax Regs. Factor (5): The Success of the Taxpayer in Carrying on Other Similar or Dissimilar Activities.
The parties agree that petitioner engaged in no similar or dissimilar activities. Factor (6): The Taxpayer's History of Income or Losses with Respect to the Activity.
Petitioner's history of losses with respect to the farming operation is the most persuasive evidence of the absence of a profit motive. Given the information in the record concerning the operation of the farm since 1950, we are convinced that petitioner had no bona fide objective of realizing "a profit on the entire operation, which presupposes not only future net earnings but also sufficient net earnings to recoup the losses which have meanwhile been sustained." Bessenyey v. Commissioner,45 T.C. 261, 274 (1965), *655 affd. 379 F.2d 252 (2d Cir. 1967). For each of the years 1950 through 1969, petitioner suffered a substantial loss, ranging from a low of $9,853.98 in 1958 to a high of $60,456.36 in 1969. The total loss for those years was $708,123.97. [15] *656 Although petitioner had two profit years from 1970 through 1976, he sustained a net loss for these years of $103,146.91. Moreover, the reasons why profits were realized in the years 1971 and 1975 will not support a finding that petitioner made a change in the horse and cattle operations which would have caused future profits to be expected. (See page 30, infra.) As petitioner contends, a series of sustained losses is not alone determinative of a taxpayer's intent. Nevertheless the series of losses sustained by petitioners is wholly unexplained.The farming activity, having been commenced by petitioner's father in 1915, has certainly advanced beyond the initial stages in which losses might not be inconsistent with a profit motive. Bessenyey v. Commissioner,supra.Moreover, notwithstanding substantial losses, the record discloses a lack of repeated efforts by petitioners to reap a profit.Cf. Engdahl v. Commissioner,supra at 669; Allen v. Commissioner,72 T.C. 28, 35 (1979). Factor (7): The Amounts of Occasional Profits, if any, which are Earned.
As indicated above, from 1950 through 1969 petitioner sustained losses totaling $708,123.97 from his farming operation and from 1970 through 1976 he sustained a net loss of $103,146.91 therefrom. *657 Petitioner realized profits from his farming activity in 1971 and 1975. The 1971 profit of $14,281.84 was attributable to the number of horses sold in that year. These horses were sold pursuant to Dr. O'Keefe's advice as to how petitioner could "show a profit." The 1975 profit of $3,610 was attributable to the sale of most of petitioner's breeding stock as the result of his farm manager's death. Given the amounts of the profits earned in relation to the amounts of the losses incurred and the sources of the profits, we are able to give the profits little weight in making our determination as to whether the farming activity was engaged in for profit. Petitioner, however, contends that the racing and breeding of thoroughbred horses is a highly speculative venture at which he had the opportunity to earn a substantial ultimate profit. Section 1.183-2(b)(7), Income Tax Regs. Petitioner would have us find that his operation was capable of producing an outstanding horse, so as to generate a substantial ultimate profit. In an effort to make us conclude that there is "some reasonable basis for" [16] so finding, petitioner calls our attention to the winnings of the foals of the 10 mares *658 he owned from 1970 through 1976 and the winnings of the horses sired by the stallions to which he bred some of his mares. In response to petitioner's argument, respondent maintains that: (1) the average winnings of the produce of petitioner's mares are only slightly greater than the average winnings of the progency of all mares and (2) petitioner's argument as to the quality of the outside stallions bred by him "goes only so far" because each year he only tried to breed two or three outside stallions to his mares. For us to become embroiled in a dispute as to the caliber of the mares and stallions bred by petitioner would serve no useful purpose, since we are not seeking to ascertain whether, given the quality of such mares and stallions, an expectation of producing an outstanding horse and thereby deriving a substantial ultimate profit would not be unreasonable. Dreicer v. Commissioner,78 T.C. 642, 644-645 (1982), on appeal (D.C. Cir., June 1, 1982). Rather, the question we must resolve is whether "profit is actually and honestly [petitioner's] objective though the prospect of achieving it may seem dim." Dreicer v. Commissioner,supra. *659 Petitioner's testimony belies his argument on brief that he conducted the activity in question with the predominant intention of earning a substantial profit by developing an outstanding horse. Petitioner testified that he wants to make a profit. However, when on cross examination petitioner was asked whether, before he were to consider his horse-racing operation to be a profitable operation, he would have to earn sufficient money to pay for all his past losses or to just make a profit year by year, he responded, "Year by year." Since petitioner would regard his operation as profitable even if all his losses were not recouped, the inference is inescapable that petitioner is not like the wildcat driller or the inventor described in the regulations, [17] continuing to incur expenses because of the small chance of achieving a sufficiently large return to offset previous losses. See Bessenyey v. Commissioner,supra.
Factor (8): The Financial Status of the Taxpayer.
Another consideration is the financial status of petitioners. As petitioners point out, one cannot benefit by losing money while the tax rates are less than 100 percent. *660 Engdahl v. Commissioner,supra at 670. Nevertheless, the taking of deductions for the cost of a hobby, under the existing progressive rate structure, allows a greater share of the cost of the hobby to be shifted to the tax collector by a taxpayer in the 50-percent bracket than a taxpayer at the 20-percent bracket who takes deductions. From 1970 through 1976, inclusive, petitioners received gross income from sources other than the operation of the farm in the total amount of $491,211.49. In the operation of the farm, petitioner sustained a total net loss of $103,146.91 for those years. His net out-of-pocket loss, however, was $70,045.52. If petitioners are allowed to deduct the losses sustained in the operation of their farm, their tax savings for the years 1970 through 1976 would be approximately $58,000. [18] *662 If, for the sake of simplicity, we ignore the deduction for capital gains, allowed by section 1202, and assume that the net profits of $14,281.84 and $3,160.00 derived by petitioner from his horse and cattle operations in 1971 and 1975, respectively, are subject to the 70-percent bracket, then petitioners' taxes on the income derived from such operation would be $12,209.29 *661 for the 2 years. Thus, petitioners' after-tax expenditure for the years 1970 through 1976 would be approximately $24,254.81, or 4.9 percent of their gross income for the 7 years. Certainly, such an expenditure is not sufficient to indicate that petitioner continued the farming operation with a view to making a profit. Golanty v. Commissioner,72 T.C. 411, 429 (1979), affd. 647 F.2d 170 (9th Cir. 1981). Factor (9): The Elements of Personal Pleasure or Recreation in Conducting the Activity.
Finally, whether petitioner derived personal pleasure or gratification from conducting the cattle and horse operation must be considered. Section 1.183-2(b)(9), Income Tax Regs.
When during cross-examination petitioner was asked whether he derived some personal pleasure or satisfaction from his involvement in the racing profession and the work he does on the farm, he responded, "I do, yes." Gratification received from an activity by itself is insufficient to cause the activity to be considered not engaged in for profit. Nevertheless, the intangible pleasure derived by petitioner must be considered with the objective facts which are before us, including the large losses petitioner incurred prior to 1970, petitioner's failure to investigate the potential profitability of entering into the activity, the limited advice sought by petitioner as to the financial side of the operation, and the absence, despite regular losses, of efforts to use the income and expense data complied *663 biannually for purposes of financial planning and control. It seems to us, when we consider these factors, that petitioner's predominant intention was not be achieve a profit, but to continue a way of life that was enjoyable to him.
In sum, we decide the only issue presented for respondent. However, since the stipulation of facts establishes that, for each of the years in issue, the amount of farm gain or loss was misstated by petitioner in his tax returns and by respondent in the notice of deficiency, Decision will be entered under Rule 155.
Footnotes
1. After the petition was filed with this Court, it was determined that petitioners had erroneously reported certain earnings derived from race tracks when received, rather than when credited to their account and subject to withdrawal by them. See page 10 infra. The parties have stipulated to the amount of farm gain or loss, corrected to include earnings from the race tracks in the years earned rather than the years received, for each of the years from 1970 through 1976. Respondent has claimed that shifting the income to the correct years results in the increased deficiency claimed by him for 1975.Petitioners, on the other hand, have claimed an overpayment for 1972 based on the ground that rather than being entitled to a deduction for a farm loss in the amount originally taken on their 1972 return ($20,851), they are entitled to a deduction for a farm loss of $22,216, which is the correct amount of loss according to the stipulation of the parties, in 1972.
2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue and all references to Rules are to the Tax Court Rules of Practice and Procedure.
3. TheBloodHorse and TheThoroughbredRecord are weekly magazines devoted to improving thoroughbred racing and breeding. TheDailyRacingForm↩ is a daily publication containing up-to-date data on racing at the major tracks in America.
*. NOTE: The mares marked with an asterisk (
Those horses marked with an asterisk were 2 years old at the time they were sold or claimed.
*↩) were sold by petitioner in 1975 following the death of his farm manager.
4. A claiming race is a means of attempting to make the owner of a horse enter it in a race in which other horses of the same ability as his horse are entered. All horses entered in a single claiming race have the same claiming price set on them by their owners. If the horse shares in the winnings, the owner receives the money.However, the owner of a horse entered in a claiming race can have the horse claimed from him by any person eligible to claim and, if the horse is so claimed, the owner must sell it at the claiming price.↩
5. At trial Dr. O'Keefe testified that he thinks that the results show that they have shown a profit in 2 out of 7 years.↩
6. Section 183(b) provides as follows: (b) Deductions Allowable.--In the case of an activity not engaged in for profit to which subsection (a) applies, there shall be allowed-- (1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and (2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1). 7. Section 183(c) provides: (c) Activity Not Engaged in for Profit Defined.--For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212↩. 8. Section 162(a) provides in pertinent part: (a) In General.--There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *. ↩
9. Sections 212(1) and (2) provide: In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year-- (1) for the production or collection of income; (2) for the management, conservation, or maintenance of property held for the production of income; or↩
10. Section 183(d) provides: (d) Presumption.--If the gross income derived from an activity for 2 or more of the taxable years in the period of 5 consecutive taxable years which ends with the taxable year exceeds the deductions attributable to such activity (determined without regard to whether or not such activity is engaged in for profit), then, unless the Secretary or his delegate establishes to the contrary, such activity shall be presumed for purposes of this chapter for such taxable year to be an activity engaged in for profit. In the case of an activity which consists in major part of the breeding, training, showing, or racing of horses, the preceding sentence shall be applied by substituting the period of 7 consecutive taxable years for the period of 5 consecutive taxable years. 11. Section 183(e) provides: (e) Special Rule.-- (1) In general.--A determination as to whether the presumption provided by subsection (d) applies with respect to any activity shall, if the taxpayer so elects, not be made before the close of the fourth taxable year (sixth taxable year, in the case of an activity described in the last sentence of such subsection) following the taxable year in which the taxpayer first engages in the activity. For purposes of the preceding sentence, a taxpayer shall be treated as not having engaged in an activity during any taxable year beginning before January 1, 1970. (2) Initial period.--If the taxpayer makes an election under paragraph (1), the presumption provided by subsection (d) shall apply to each taxable year in the 5-taxable year (or 7-taxable year) period beginning with the taxable year in which the taxpayer first engages in the activity, if the gross income derived from the activity for 2 or more of the taxable years in such period exceeds the deductions attributable to the activity (determined without regard to whether or not the activity is engaged in for profit). (3) Election.--An election under paragraph (1) shall be made at such time and manner, and subject to such terms and conditions, as the Secretary or his delegate may prescribe.↩
12. See Ballich v. Commissioner,T.C. Memo. 1978-497↩.
13. Section 1.183-1(d)(1), Income Tax Regs., provides: (d) Activity defined.--(1) Ascertainment of activity. In order to determine whether, and to what extent, section 183 and the regulations thereunder apply, the activity or activities of the taxpayer must be ascertained. For instance, where the taxpayer is engaged in several undertakings, each of these may be a separate activity, or several undertakings may constitute one activity. In ascertaining the activity or activities of the taxpayer, all the facts and circumstances of the case must be taken into account. Generally, the most significant facts and circumstances in making this determination are the degree of organizational and economic interrelationship of various undertakings, the business purpose which is (or might be) served by carrying on the various undertakings separately or together in a trade or business or in an investment setting, and the similarity of various undertakings. Generally, the Commissioner will accept the characterization by the taxpayer of several undertakings either as a single activity or as separate activities. The taxpayer's characterization will not be accepted, however, when it appears that his characterization is artificial and cannot be reasonably supported under the facts and circumstances of the case. If the taxpayer engages in two or more separate activities, deductions and income from each separate activity are not aggregated either in determining whether a particular activity is engaged in for profit or in applying section 183↩. Where land is purchased or held primarily with the intent to profit from increase in its value, and the taxpayer also engages in farming on such land, the farming and the holding of the land will ordinarily be considered a single activity only if the farming activity reduces the net cost of carrying the land for its appreciation in value. Thus, the farming and holding of the land will be considered a single activity only if the income derived from farming exceeds the deductions attributable to the farming activity which are not directly attributable to the holding of the land (that is, deductions other than those directly attributable to the holding of the land such as interest on a mortgage secured by the land, annual property taxes attributable to the land and improvements, and depreciation of improvements to the land).
14. At this juncture, we note that our finding that petitioner has failed to meet his burden of proof as to why the land was held is not incompatible with our earlier determination that it is unnecessary to reach the issue whether the section 183(d) presumption should be accorded its usual weight. If the requirements of section 183(d) are satisfied with respect to any activity, the only presumption raised by section 183(d) is that such activity is engaged in for profit. The preliminary question confronting us here is whether two separate undertakings -- the holding of Westover and Buck Island and the cattle and horse operations -- constitute a single activity. In this connection, the first who sentences of section 1.183-1(d)(1), Income Tax Regs., provide: In order to determine whether, and to what extent, section 183 and the regulations thereunder apply, the activity or activities of the taxpayer must be ascertained. For instance, where the taxpayer is engaged in several undertakings, each of these may be a separate activity, or several undertakings may constitute one activity. If the undertakings involved herein were established to be a single activity under section 1.183-1(d)(1), Income Tax Regs., then the section 183(d) presumption, if applicable, would impose upon respondent the burden of proving that petitioner does not "intend that, even if no profit from current operations is derived, an overall profit will result when appreciation in the value of land used in the activity is realized." Section 1.183-2(b)(4), Income Tax Regs.↩ Since petitioner has failed to establish that the two undertakings constitute a single activity, we need not consider whether petitioner has successfully shifted to respondent the burden of proof as to the ultimate issue.
15. Petitioner contends that we should ascribe little significance to the losses sustained prior to 1970, since the Commissioner audited his income tax returns for 1968 and 1969, assessed additional taxes for those years based on the ground that the farming operation was not a business operated for profit, and later reached a compromise with petitioner whereby one-half of the originally proposed assessment was accepted by him.Respondent counters that, under Rule 408 of the Federal Rules of Evidence, evidence that a claim was compromised is not admissible to prove the invalidity of the claim. Even were we to rely on the compromise in this case for the purpose of finding that respondent's claim with respect to the years 1968 and 1969 had no validity, it would not change our ultimate holding in this case. Accordingly, we do not consider whether we may regard the compromise as evidence.↩
16. See section 1.183-2(c)↩, Example (6), Income Tax Regs.
17. Section 1.183-2(c), Examples (5) and (6), Income Tax Regs.↩
18. The total amount of the deficiencies originally determined by respondent for the years 1970, 1972, 1973, and 1975, which are set forth at the outset of our opinion, is $58,897.49. On brief, respondent states that the tax savings which would result from allowing deductions for losses in the amounts to which the parties have stipulated as being the amounts of the losses petitioner actually incurred (that is, adjusted to correct petitioner's erroneous method of reporting income from the tracks, see page 10 supra) are approximately as follows: $15,702 for 1970, $11,214 for 1972, $12,358 for 1973, $7,055 for 1974, and $13,008 for 1976, or $59,337 in total. We have used $58,000 for the sake of simplicity. In addition, by estimating $58,000 as the amount of tax savings, the outcome of the present analysis is more favorable to petitioners than if we were to estimate the tax savings as $59,000 or $60,000.